# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ANDREA FAVELA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15-cv-4028-JES-JEH |
| | ) | |
| JEFFREY BOYD, ROCK ISLAND | ) | |
| COUNTY, and SHERIFF OF ROCK | ) | |
| ISLAND COUNTY, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER AND OPINION

Now before the Court are Defendant Rock Island County's Motion for Summary Judgment (Doc. 96) and Plaintiff's Motion for Summary Judgment (Doc. 100). Plaintiff filed a response to Defendant's Motion on February 26, 2019 (Doc. 104) and Defendant Rock Island County filed a reply on March 12, 2019 (Doc. 105). Defendant Rock Island County filed a response (Doc. 103) to Plaintiff's Motion on February 26, 2019, and Defendant Boyd filed his response on March 27, 2019 (Doc. 110). Plaintiff filed a reply on April 2, 2019 (Doc. 111). A hearing on this matter was held on May 16, 2019. For the reasons set forth below, Defendant Rock Island County's Motion (Doc. 96) for Summary Judgment is DENIED, and Plaintiff's Motion (Doc. 100) for Summary Judgment is DENIED.

**BACKGROUND**

## A. Undisputed Facts

The following facts are undisputed by the parties.[1] Defendant Jeffrey Boyd ("Boyd") was the Sheriff of Rock Island County in 2013. He met Plaintiff Favela ("Favela") at DePaepe's Gym in the fall of 2013. After speaking with her, he left his business card on her windshield, offering to help her seek full U.S. citizenship through his professional contacts. Between fall of 2013 and February of 2014, Boyd developed an attraction to Favela. In February 2014, Boyd gave Favela numerous gifts (jewelry, flowers, letters, workout gear) that she told him she could not accept but he refused to take back. At some point, he acquired her home address, as he had the flowers sent directly there. He also gave her money for a diet plan and told her she could pay him back when she had finished it. Between February 13 and 27, 2014, Boyd sent Favela over 461 texts. Favela told Boyd to stay away from her and leave her alone, and he told her "[t]hat's how I know you are into me." Doc. 100, p. 5; Doc. 100, Exh. C, message 50. Boyd told her that his marriage was in trouble, and that he was attracted to her. He continued to offer to help her with her citizenship status and make sexually forward comments, such as referencing his sperm count and sending her a shirtless photo of himself.

On February 19, Boyd told Favela that if he truly wanted to hurt her, he would inform all of his co-workers who lived near her of her driving status (she did not possess a valid Illinois driver's license). Favela responded the next day that she would find ways other than driving to get to the gym, and repeated her request that he leave her alone. Favela told him that he was retaliating against her because she had rejected his advances for an extra-marital affair. On

---

[1] The undisputed facts are taken from the parties' agreed facts as outlined in Docs. 96, 104, 105, 103, 110, and 111.

February 21, Boyd replied, telling her that he had warned her about driving illegally and that she could be arrested.[2] He further said "you want to go up against me…good luck."

On March 15, 2014, Boyd pulled Favela over and gave her a verbal warning not to drive without a license. The same day, Boyd instructed Deputy Prine to look for Favela's vehicle, as he suspected she would continue driving illegally. On April 2, 2014, Boyd spent several hours researching Favela, then wrote her a traffic citation and kept it. The next morning, he met with Deputy Baney and directed him to serve Favela with the traffic citation. Favela refused to accept the ticket, explained to Deputy Baney that she believed Boyd had no basis to issue that ticket, and Deputy Baney returned the ticket to Boyd. Boyd held onto it, believing he had 18 months to petition the court to issue it or seek a warrant for her arrest. On April 4, 2014, Boyd told Favela that she could be arrested if she didn't "figure out [her] ticket with [him]." On a prior occasion, he had told Favela that she would be serving days or months in the county jail if he ticketed her for every instance he saw her driving. On April 25, 2014, Boyd again texted Favela that the court date was approaching on the ticket she refused to sign. The ticket was never served on Favela, never filed with the court, and Favela was never made to appear in court.

On March 22, 2014 Favela saw Boyd's car parked on the street behind her home, with a view of her garage. Sometime after April 2, 2014, Boyd parked behind Favela's home for an hour and a half and observed vehicles coming and going from the residence. He used his authority as sheriff to obtain video footage from a pawn shop that he believed depicted her driving. Before June 2014, Boyd drove near her residence three to four times a week, looking

---

[2] While Defendants Rock Island County and the Sheriff of Rock Island County do not dispute this, Boyd does, claiming that he never said she could be arrested. However, Plaintiff attached text records indicating that on February 21, 2014, Boyd sent a message reading "If you get arrested for driving it is not because you did not know."

through her trash for indicia of residency and documentation of illegal activity, and running the plates of vehicles he saw.

Favela got a new phone number in order to avoid Boyd's texts, but he obtained her new number through DePaepe's Gym and continued texting her. On June 6, 2014, he used an application that made his phone number anonymous to continue sending her text messages. In particular, he sent her a message calling her obscene names in Spanish. That message was the subject of a prosecution for Attempted Official Misconduct, and Boyd entered an Alford plea on that charge, agreeing that there was a sufficient factual basis to find that he sent the message and earlier texts, which he should have known could cause a reasonable person to suffer emotional distress. On March 3, 2015, Plaintiff initiated this case.

## B. Disputed Facts

The cross-motions for summary judgment in this case depend largely on which of Boyd's actions, if any, were within the scope of his employment. The Court therefore focuses the examination of disputed facts on the matters bearing on those issues.

### Scope of Sheriff's Duties

Defendant Boyd and Plaintiff agree that when Boyd was Sheriff, he was "working as Sheriff, 24 hours a day, seven days a week." Defendant Rock Island County contends that his hours of service were regularly 8am–5pm, pursuant to state statute 55 ILCS 5/3-6019.

### Use of Law Enforcement Resources

Defendant Boyd and Plaintiff refer to the Dodge Durango he drove as "department-issued specifically to him." Defendant Rock Island County contends that during his tenure as Sheriff, certain employees such as himself were issued unmarked squad cars equipped with lights and sirens, which they were permitted to use for personal business while they were off-duty. If a

Sheriff's Deputy was utilizing an unmarked vehicle for personal use, Boyd's policies dictated that they carry their badge and service weapon. All parties agree that Boyd kept various law enforcement equipment and supplies in his Sheriff's vehicle, including a ticket book.

Defendant Boyd and Plaintiff agree that Boyd used a cell phone supplied by the Sheriff's office for both personal and professional communications. Defendant Rock Island County states that the phone number Boyd used before becoming Sheriff was the same as the one he used while Sheriff and he continues to use today—Boyd testified that the County paid the phone bill, but Rock Island County holds that the phone was not issued by the Sheriff's department.

Plaintiff alleges that between February and April 2014, Boyd used his Sheriff's access to a database and to the County's dispatcher to research Plaintiff's personal information, such as her arrest record, driving record, legal names used, bank information, prior marriages and divorces, and residential addresses. Rock Island argues that Boyd has testified that he used a publicly available database to do this research, and that he did not use any law enforcement resources to determine her home address. Boyd claims that he researched Plaintiff's information on a public database, with law enforcement access designation paid for by the County, to find her information to corroborate statements she had told him about her citizenship and residency. Boyd agrees that in April 2014, he used law enforcement sensitive databases to issue a citation and conduct an investigation into Plaintiff. However, Boyd claims that he initially learned Plaintiff's address directly from her, though Plaintiff disputes that.

*Boyd's Conduct and Motivations*

According to Plaintiff and Rock Island County, in February 2014, Boyd was motivated by a desire to know Favela's story and identity, and later by his desire to have a romantic relationship with her. Boyd claims he just wanted to help her, and to maintain a friendship with

her. Plaintiff and Rock Island County agree that when Boyd offered Favela a gift of workout gear, he initially joked that he had a ticket for her. Boyd claims he did not make that joke. Additionally, Rock Island County and Plaintiff assert that Boyd was threatening Favela with arrest throughout February 2014, but Boyd holds that he only threatened her with a ticket citation. Plaintiff and Rock Island County agree that Favela stopped going to the gym in March 2014 to avoid Boyd after he gave her the middle finger. Boyd claims that he never made that gesture towards her.

All parties agree that on April 2, 2014, Boyd wrote Favela a citation for driving without a license. Boyd claims that he saw Favela driving, knowing that she did not have a valid Illinois driver's license, and that was the basis for the ticket. Favela claims that Boyd actually saw her sister and mistook her for Favela. This was the basis Favela asserted when she refused to accept the ticket, and Deputy Baney returned it to Boyd.

## LEGAL STANDARD

Summary judgment is proper where the materials in the record demonstrate that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The role of the judge in resolving a motion for summary judgment is not to weigh the evidence for its truth but to determine whether sufficient evidence exists that a jury could return a verdict in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Thus, in order to survive a motion for summary judgment, the non-movant must show specific facts that demonstrate the existence of genuine issues for trial. *Id.* The Court will construe the record "in the light most favorable to the non-movant" in deciding whether the case involves genuine issues of fact requiring a trial. *Payne v. Pauley*, 337 F.2d 767, 770 (7th Cir. 2003). However, mere allegations in the complaint by a non-movant plaintiff will not suffice;

instead, they must show admissible evidence such as depositions that show genuine disputes of material fact. Fed. R. Civ. P. 56(e)(2); *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).

DISCUSSION

**I. Defendant Rock Island County's Motion for Summary Judgment**

Defendant Rock Island County has moved for summary judgment on the grounds that the office of the Sheriff and the County itself cannot be held liable for Boyd's actions, as they "fall outside the scope of duties of Sheriff, do not constitute policies or practices of the office of Sheriff, and are not eligible for indemnification under the Illinois Tort Immunity Act." Doc. 96, p. 2. Defendants Rock Island County and the Rock Island County Sheriff claim that Boyd's acts in his personal capacity, rather than any official policy, gave rise to Plaintiff's suit. Doc. 96, p. 21. Rock Island County asserts that Boyd's conduct was driven by "a wholly personal motivation," outside the scope of his duties as Sheriff, and therefore could not constitute official policy decisions. *Id.* at 22 (citing *Wright v. City of Danville*, 675 N.E.2d 110, 119 (Ill. 1996) (official misconduct for purely personal purposes outside the scope of employment)).

The Seventh Circuit has "warned repeatedly against trying to resolve indemnity before liability." *Doe v. City of Chicago*, 60 F.3d 667, 672–73 (7th Cir. 2004) ("The issue of the City's responsibility for the torts of its police officers is a difficult one that the district judge should not have attempted to resolve before the actual facts bearing on the issue were determined."). Although district courts have sometimes ruled on indemnity in connection with a motion for summary judgment, they do so where there is no genuine dispute of fact bearing on the issue. *See, e.g., Klingler v. City of Chicago*, 2017 WL 4742192 at *5–6 (N.D. Ill. 2017) (Will County and City of Chicago not required to indemnify Will County officer who initiated an arrest in Chicago, outside of the Will County jurisdiction); *cf. Doe v. Clavijo*, 72 F. Supp. 3d 910, 915 (N.D. Ill. 2014) (denying motion for judgment on the pleadings because sexual assault by on-

duty policeman not definitively outside scope of employment as a matter of law); *Klipfel v. Gonzalez*, 2006 WL 1697009 at *14 (N.D. Ill. 2006) ("In order to ascertain whether Miedzianowski's allegedly defamatory conduct was within the scope of his employment, the exact parameters of that conduct must be ascertained.").

Here, disputes of fact remain as to the parameters of Boyd's conduct (e.g. whether he used certain law enforcement resources, whether he gave Favela the middle finger at the gym, whether he threatened to arrest her). Most saliently, disputes remain as to Boyd's motivations for his behavior. "Even if the employee is acting out of malice, ill will, or self-interest, his conduct may still fall within the scope of employment so long as it is motivated, at least in part, by a purpose to serve the master." *Copeland v. County of Macon, Ill.*, 403 F.3d 929, 934 (7th Cir. 2005) (quoting *Taboas v. Mlynczak*, 149 F.3d 576, 582–83 (7th Cir. 1998)). The Seventh Circuit applies this rationale such that even conduct that clearly abuses the office's power may be considered within the scope of an officer's employment when motivated, in some part, by a purpose to serve the office. *See, e.g., Wilson v. City of Chicago*, 120 F.3d 681, 685 (7th Cir. 1997) (torturing suspects to extract confessions); *West v. Waymire*, 114 F.3d 646, 649 (7th Cir. 1997) (coercive statutory rape during curfew enforcement activities); *Argento v. Village of Melrose Park*, 838 F.2d 1483, 1495 (7th Cir. 1988) (post-arrest beatings); *Hibma v. Odegaard*, 769 F.2d 1147, 1153 (7th Cir. 1985) (using police resources and authority to frame someone else for police officers' crimes).[3]

---

[3] Additionally, the Seventh Circuit has suggested that even where a law enforcement officer has *no* motive to serve his employer, the "wave of the future" may be to treat counties with strict liability for the torts law enforcement officers commit through the use of their police authority. That is, because a police officer has unique authority to arrest, to access personal information, "to develop and project an intimidating aura," and to pose physical danger to others, he is "inescapably a dangerous instrumentality." *Doe v. City of Chicago*, 360 F.3d 667, 671 (7th Cir. 2004). However, the Seventh Circuit declined to certify the question to the Illinois Supreme Court in *Doe* because the underlying facts were not sufficiently developed in that case. The question of whether the scope of employment analysis applies

Defendant Boyd holds that he was motivated to ticket, investigate, and follow Favela in part by a desire to enforce the law, as he believed she was repeatedly driving without a license and initially could not determine her citizenship status. Doc. 110, p. 20 ("[T]hereafter actions by Defendant Boyd were all related to law enforcement actions to enforce traffic laws and investigate a person engaged in repeated violation of the law, using alias names, and possible [sic] engaged in illegal drug activities."). Because this factual dispute remains, and would be determinative of indemnity, summary judgment for or against Defendant Rock Island County and Defendant Rock Island County Sheriff would be premature at this time. *See Doe v. City of Chicago*, 360 F.3d at 673. Defendants' Motion for Summary Judgment is therefore DENIED.

## II. Plaintiff Favela's Motion for Summary Judgment

Plaintiff argues that she is entitled to summary judgment because the undisputed facts demonstrate that Defendant Boyd acted in his official capacity, under color of law, to violate her due process and equal protection rights. Doc. 100, pp. 12–21. Plaintiff holds that Boyd was clearly acting within the scope of his employment when he committed the actions at issue. *Id.* at 21–22. Plaintiff further asserts that the undisputed facts support her state law claims of willful and wanton conduct and intentional infliction of emotional distress against Defendant Boyd, as well as her claim that the County must indemnify him. *Id.* at 24–30.

Construing the record in the light most favorable to all Defendants, the Court cannot conclude that Plaintiff is entitled to summary judgment. Defendant Boyd has sufficiently demonstrated factual disputes regarding his conduct, his motivations, and the effects on Plaintiff.

---

differently to police officers, particularly when they are accused of sexual misconduct, remains unanswered. *See Doe v. Clavijo*, 72 F. Supp. 3d 910, 916 (N.D. Ill. 2014); *Doe v. St. Clair County*, 2018 WL 3819102, at *4 (S.D. Ill. Aug. 10, 2018) (noting that the Seventh Circuit has suggested that "the scope of employment should be interpreted more broadly when the employee is a police officer" but that the Illinois Supreme Court still had not resolved the issue).

For example, he testified that he genuinely saw Plaintiff driving her car on April 2nd, 2014, and wrote her a traffic citation according to that observation, while Favela maintains that he was mistaken. As described above, there also remain factual disputes about whether Boyd was motivated in part by his official job duties—if Boyd "had no intention to further the [County's] interest but [was] motivated solely by a desire to gratify [his] personal interests," he might not be subject to official-capacity liability, and the indemnification claim could fail. *See Gambling v. Cornish*, 426 F. Supp. 1153, 1155 (7th Cir. 1977). To the extent that some of Boyd's conduct was clearly based solely on personal motivations, the Court declines to rule on each individual act that, when taken together with all the other allegations, may or may not support Plaintiff's claims. Because these determinations rest on contested factual matters best submitted to a jury, Plaintiff's Motion for Summary Judgment is also DENIED.

## CONCLUSION

For the reasons set forth above, Defendant Rock Island County's Motion (Doc. 96) for Summary Judgment is DENIED, and Plaintiff's Motion (Doc. 100) for Summary Judgment is DENIED.

Signed on this 7th day of August, 2019.

/s James E. Shadid
James E. Shadid
United States District Judge